STATE OF MISSOURI at the Relation of ISAAC S. BRISTOL,
Relator, v. CYRUS P. WALBRIDGE, Mayor of
City of St. Louis, Respondent.

St. Louis Court of Appeals, March 17, 1897; Motion for
Rehearing Overruled March 25, 1897.

1. **Public Officer, Inference in Absence of Act Prescribing
Duties Of.** In the absence of any act prescribing and defining the
duties of a public officer, his duties may be inferred from his employ-
ment, and the nature of the office.

2. **Pleading, Objection To Sufficiency of:** TRIAL PRACTICE. An
objection to the sufficiency of a pleading must be made before trial,
by special demurrer or by motion to make more definite and certain;
it comes too late in this court.

3. **Public Officer:** DEFAMATORY PUBLICATION BY, REFLECTING ON
ACTS OF OFFICIAL SUPERIORS: REMOVAL "FOR CAUSE." The publica-
tion and circulation, by the superintendent of a public institution,
of a defamatory article, printed by the inmates upon a public press
in use in the institution, reflecting upon the acts of his official equals
and superiors in making official inquiry into its condition, without
any defense or excuse therefor, was sufficient to justify his removal
from office "for cause" within the meaning of that term in legal
intendment.

*Certiorari.*

MOTION to quash judgment overruled, and judgment for respondent.

*Chester H. Krum* for relator.

Removal "for cause," in legal intendment, means upon sufficient charges, notice thereof, and hearing. *State ex rel. v. Walbridge,* 62 Mo. App. 164. See, also, *People ex rel. v. Commissioners,* 72 N. Y. 449; *State v. Jersey City,* 1 Dutch. (N. J.) 536; Coke in *Baggs* case, 6 Coke Rep., part 2, 93 (quoted 11 Coke 93); *Regina v. Lane,* Fortescue, 273; *Clark's* case, 2 Crooke, 506; *Regina v. Treasury,* 10 Ad. & E. 374.

Merely one infraction of duty, not being in itself evidential of grossly improper behavior, will not justify amotion from public office. *Rex v. Wells,* 4 Burroughs, 1999, 2004. See, also, *Rex v. Taylor,* 3 Salk. 231.

No brief filed for respondent.

BLAND, P. J.—On February 9, 1897, the relator, Isaac S. Bristol, was the superintendent of the house of refuge in the city of St. Louis. On that day there was filed before Cyrus P. Walbridge, the mayor of said city, the following charges and specifications against the relator:

"*Charge.*

"I.

"WILLFUL VIOLATION AND NEGLECT OF OFFICIAL DUTY.

"Specification I. In this, that you, Isaac S. Bristol, superintendent of the house of refuge, heretofore

duly appointed such by the mayor of the city of St. Louis under the provisions of section 2, of article 4, of the charter of the city of St. Louis, which house of refuge exists by virtue of an act of the general assembly of Missouri entitled, "An Act concerning the St. Louis house of refuge," approved February 24, 1873, and which by said act is an institution under the control of a board of managers therein provided for, and which institution is likewise under the visitatorial supervision of the commissioners on charitable institutions, as provided by section 49, of article 4, of the charter of the city of St. Louis, and which board of managers and commissioners on charitable institutions were, at the time hereinafter stated, and are now, officers of the city of St. Louis, and your superior officers, did heretofore, to wit, on or about the fifteenth day of October, 1896, while acting as such superintendent of such house of refuge, and while owing official duty and respect to your said superior officers, the board of managers of said house of refuge and said commissioners on charitable institutions, publish and circulate the following false, libelous, scandalous, and disrespectful charges of and concerning your said superior officers, said managers of said house of refuge and said commissioners on charitable institutions to wit:

"'Bed Bugs On The Brain.

"'Charity and House of Refuge Ladies Have Them—Women-Democrats Want to Worry Mr. Bristol out of Office.

"'It is the nature of a hen to set. Some hens do it as a duty. Some do it as a craze. The last are a nuisance. You can't break them of it. It's not their fault, but their nature.

" 'The house of refuge is like unto a nest, on which several old hens are trying to hatch out trouble. It is their nature and we bespeak unto them charity. They can't be broke of it. As the hen that layeth not, but forever desireth to set, doth cakel long and loud betimes to attract unto herself the eyes of the roosters, so doth the hens which do wear skirts, and which do without ceasing sit on the charity nest make much noise; for it getteth her name in the papers and maketh her to rejoice with the fullness of notoriety.

" 'Two o'clock Monday, council chamber, Superintendent Bristol arraigned; charges by the charity commissioners, the same being women-democrats and other democrats who wear pants and bask in their smiles.

" 'A more frivolous farce than madman with diseased imagination ever faked in an erratic fancy, was enacted. Martha Fischel, president of the charity commission, was chairmaness; a most recherche woman, wonderfully refined for a democrat. Mrs. Richter, Louis J. Singery, W. H. Lee, Geo. C. Hitchcock and others, supported her.

" 'A score of exquisites and aesthetics staid by, viewing the plebian witnesses with lorgnettes, asking questions in lofty tones and elevated language and applied their viniagnettes between smells, the scent of a common person being quite irritating. Interpreters to translate their queries into plain English.

" 'Mary M. Brown was a witness. The presidententess asked her if the lingerie of the protegees within her jurisdiction was transposed with sufficiently frequent periodicity, to properly interrupt the development of insect life. In other words, to be more lucid, were the youth of that institution dissociated from their environments of muslin and re-enveloped in petit

garments that had been subjected to a proper degree of purification at intervals of a fortnight or so.

" 'That was the question. The elegance of the chairmaness' diction intoxicated the senses of the witness and lulled her fancy into a labyrinth of delicious bewilderment. She didn't revive until the vulgar jargon of Judge Chesterfield Krum, Bristol's attorney, asked:

" ' "She wants to know if the girls change their chemise once in a while?"

" ' "Oh yes, oh yes—yes, they change once in a while, only the colored girls, that ain't got any."

" 'Often enough to arrest growth of bed bugs?

" 'The witness didn't know how long it took to breed a bed bug.

" 'Geo. Oger, a laborer, was put on the rack. He couldn't catch onto anything but the most abominable plain English. A great gulf yawned between him and his cultured inquisitor. He was half a-scared of her. She didn't seem to know what she wanted to find out and it was dead certain he didn't.

" 'John H. Raymond, for forty years bookkeeper of the house of refuge, took his seat and began revealing what he didn't know. He admitted that Bristol had run the place very much like other men, only some better, that it was in better condition than before.

" 'Judge Krum asked: "Can you give one instance of double dealing or deception by Mr. Bristol!"

" ' "No sir."

" 'Krum often objected but the ladies overruled him. The most absurd questions, relevant to nothing in the charges and not pregnant with any sense, were put, sense, system or order. It was an object lesson in how women run things when they get into politics. The modest and gentle females seem about as well

adapted to the affair on hand as a hod carrier to doing duty as a wet nurse.

"'Mrs. Damon was a valuable witness. She is one of the "Managers." She is devoted to the belief that charity begins at home and had her probable brother-in-law Dr. Hall, a nice little fellow who will be a man if he keeps on growing, and who disguises his boyishness in a long Prince Albert, the skirts of which he lifts a la lady, at muddy crossings—had him made doctor of the refuge at $50 a month. She wanted some other things, but Bristol persisted that the refuge was for friendless waifs. She soured on Bristol. Oh, how her tongue did strive to down him. And how the dear doctor did try to roast him when he spoke his pretty little speech.

" 'Superintendent Bristol sat by concerned lest it be shown that no bed bugs rendezvoused at the refuge. It is well known that St. Louis is the Mecca to which all good bed bugs turn their longing eyes, and toward which healthy bugs trend; and hence the fame of this city for its superior breed of these miniature animals. Travelers say that all trains coming into this city, especially Pullman cars on which these insects, being of luxurious tastes, prefer to travel, are abundantly supplied; and the porters say that the animals leave the cars on their arrival here and at once locate for business. This they determine because of the utter absence of them from outgoing trains. Consequently these little tricks are so prevalent in St. Louis that most people wouldn't feel at home if they found their houses deserted by the tiny birds, which, like the phantom bugs in Macbeth's drain,

" ' "Do murder sleep."

" 'Hence the superintendent feared that, were it known that the refuge were tabooed by bugs the citizens of this great community would try to break into

it, and convert it into a summer resort, dissolve the establishment, and abolish the positions pertaining thereto.

" 'On the other hand, Chesterfield Krum didn't want the commission to officially declare that no bed bugs lingered in those precincts lest that their utter absence would lead the public to think it a pretty tough place, much as a ship deserted by rats.

" 'Mrs. Doctor Trelease fidgeted about for an hour waiting for a chance to express her pent up emotions. She is boss woman of the refuge managers and has got it in for Bristol, bad. While the chairmaness tried to find out what the witness didn't know, Mrs. Trelease mildly exercised her talking machinery and got it into good training.

" 'When at last the eventful moment came she eagerly seized upon the witness chair and made it to groan with its precious burden. Having put herself in the most public place, the public, or that part that was there, began to size her up. They at once drew the conclusion that she was a mighty solid girl. Various estimates were made, the consensus of opinion averaging her at two hundred and sixty-seven pounds, four ounces avordupois, though the amplitude of fabrics about her person made guessing hazardous. The public put it down that she had lovely pink-pearl ears and exquisite opalescent eyes changeable in tint.

" 'Whatever else she had the public was impressed that she had a great gift of speech. Did you ever see one of those switch engines that has a bell run by machinery, that starts when the engine does and stops when the engine stops? At first the sound is musical, and it keeps on, and keeps on, and keeps on, and at last you yearn to open a switch and dump the whole business in the river.

" 'Well, she kept on, and kept on. The chairlady tried to ask questions and the lawyers tried to, but the queries fell like rain drops on a duck's back. Some of them feared her talking apparatus would get a hot box, but it seemed it must have been lubricated by a master mechanic.

" 'Ever and anon her ample mouth would pause and supply the bellows connected therewith with a few more cubic metres of atmosphere and then she would begin blowing again.

" 'She had seen bed bugs and all sorts of horrors. She thought Bristol a horrid man. He wouldn't salaam before ladies of the board. He refused to be impressed with the sense of their importance. The yards were knee deep in mud and the ladies had to wear skirts cut dancing length and tie them up to get through.

" 'He must have devoted his time and that of his assistants to going out into the neighborhood, gathering up dirt and refuse to bring in and dump on the floors and lawn. He must have taken a fiendish delight in making the girls wash their night shirts in mud puddles. Of all the bad men in the nineteenth century he was the worst.

" 'How long the farce would have lasted nobody knows; but the husband of one of the women leaned over and whispered that the baby was locked up alone and the servant playing euchre with the policeman of the beat—and adjournment was had at once.

" 'If Mrs. Dr. Trelease should be appointed judge of a court in the next world and Bristol should come before that tribunal there is no telling where he would go to, for hell wouldn't be half hot enough for him in her estimation.

" 'The fact of the matter is that Mr. Bristol has been attending to the city's business and his wards, and has refused to fool away time in attentions to the board

of busybodies, who have been accustomed to going down there and have the superintendent lay off and let things go their own way while he flattered the vanity of the "lady managers." '

"Specification 2. In this, that you, Isaac S. Bristol, superintendent of said house of refuge of the city of St. Louis, constituted and composed and controlled as in specification 1, herein set forth, while acting as such superintendent and having control of the persons and inmates thereof, did on or about the fifteenth day of October, 1896, cause to be set up in print on a printing press belonging to the city of St. Louis and in use at said house of refuge, by the inmates of said house of refuge or by other persons unknown, the false, libelous, scandalous and disrespectful charges particularly specified in specification 1 hereof and concerning your superior officers, said board of managers of said house of refuge and said commissioners on charitable institutions, and did knowingly cause the same to be published and circulated in the city of St. Louis.

"Specification 3. In this, that you, said Isaac S. Bristol, superintendent of said house of refuge aforesaid, organized, composed, and controlled as aforesaid, while having under your control the inmates of said house of refuge did, heretofore, to wit, on or about the fifteenth day of October, 1896, permit to be printed upon a printing press belonging to the city of St. Louis, in said house of refuge, by the inmates thereof, or other persons unknown, and to be circulated the false, libelous, scandalous, and disrespectful charges fully specified in the first specification hereof, of and concerning your said superior officers, said board of managers of said house of refuge and said commissioners on charitable institutions.

"All contrary to the provisions of said act creating said house of refuge, and of the charter of the city of St. Louis, and prejudicial to the public service of said city, and calculated to bring the administration of public affairs relating to said house of refuge into disrespect and disgrace."

Bristol was duly notified of the filing of these charges and specifications and of the day set for their hearing, February 13, on which day Bristol appeared before the mayor and procured a continuance to the sixteenth day of February. On that day he appeared before the mayor, filed a motion prepared by his attorney; Judge Krum, to quash the charges and specifications. This being overruled, Bristol entered a plea of not guilty to the charges and specifications, whereupon he was asked by the mayor if he was ready for trial. To this he made no reply, but arose, saying to the mayor, "I bid you good-day, sir," and departed from the mayor's presence and office. The mayor, as appears by his return, proceeded to hear the testimony adduced in support of the charges and specifications, and at the conclusion of such hearing found relator guilty of the charge, and of each and all of the specifications under the charge, and entered judgment removing him from his office of superintendent of the house of refuge.

To review this proceeding and judgment of the mayor, the relator has brought the record and proceedings in the case to this court by writ of *certiorari*. Under this writ our authority to look into the matter is confined to the record of the proceedings before the mayor. We are not permitted to hear evidence, nor could we review the evidence had it been preserved and certified to us along with the other proceedings. The office of the writ in this state is the same as at common law, that is, to bring the record of the proceedings of

an inferior court or tribunal before a superior court to determine whether it had acted legally and within its jurisdiction. *State ex rel. v. Edwards*, 104 Mo. 125; *State v. Buchanan Co. Board of Education*, 108 Mo. 235; *Ward v. Board of Equalization of Gentry Co.*, 36 S. W. Rep. 648; *State ex rel. v. Walbridge*, 62 Mo. App. 162; *State ex rel. v. Moniteau Co.*, 45 Mo. App. 387.

By section 3, Session Acts of 1873, it is provided: "That every child found in the city of St. Louis in a state of want, or abandonment, or improperly exposed, or grossly neglected by its parents or persons having its charge, and every child of any person in said city convicted of being a common prostitute, or keeper of a bawdy house, etc., and every child found living in such house, may be committed to the house of refuge. By the same act it is required that the viciously disposed be kept separated from the well disposed inmates, and the board of managers are required to provide educational facilities and suitable employment for the inmates." From the foregoing provisions of the act of 1873, it will be seen that the house of refuge, as its name signifies, is an institution established and maintained by the city of St. Louis, under the sanction and authority of the state, for the benefit of the most exposed and unfortunate of the city's young children, such children, if unprotected and uncared for by the city, as would either find an early grave from neglect, starvation, or from brutal treatment, or surviving, would grow up in ignorance and vice. The object of this charity is twofold: *First*, to provide a place of refuge, a home for the unfortunate and outcast children of the city; *secondly*, to provide for them educational facilities and training in industrial pursuits. For the latter purpose the printing press mentioned in the specifications and charges against relator, it is fair

to assume, was furnished by the city to the house of refuge.

It is contended that the record does not show that Bristol had any duties to perform as superintendent; that neither the board of managers, under the act of 1873, nor the city council, under the charter of the city, have ever prescribed and defined what his duties shall be. If this be true, does it follow that he had no duties, owed no services as such superintendent? We think not. This office from its very nature carries with it duties which readily suggest themselves to the mind. The name of the office itself indicates a superintending control and direction of the internal and external affairs of the institution. His office was that of chief administrator of this charity. It was his duty to see that the beneficent objects of the charity were faithfully executed, and that those for whose benefit it was established and is maintained, received the educational and industrial training provided for them. It was also a part of his official duty to open all of its departments, schools and workshops when required, to the inspection of the visitorial board, and to give to such board all necessary facilities to make such inspections thorough and complete, and to hear and respectfully consider such suggestions as to the condition and improvements of the house as said board might make to him from time to time. To this board he owed respect, and it was his duty to carry into effect its recommendations as to the administration of the affairs of the house, so far as practicable and consistent with the objects and purposes of its establishment. He was found guilty by the mayor of permitting to be printed on the printing press in the house of refuge, and to be set up by its inmates, the article certified here as a part of the record of the case

*PUBLIC officer: inference in absence of act prescribing duties of.*

heard by the mayor, which article he was found guilty of circulating also. It is contended by relator that these things of which he was found guilty constitute no cause justifying his removal. If this contention is correct as a legal proposition, then this proceeding should be quashed. The charter of the city of St. Louis does not specify for what causes a city officer like the relator may be removed, but provides that such removal may be made for "cause." When this term is used in constitutions, statutes, and city charters, the authorities are all to the effect, that the cause justifying a removal is a judicial question to be determined from the facts. Many adjudications are to be found in the books designating what facts will and what will not justify *amotion* from office for cause. In the case of *People ex rel. v. Commissioners*, 72 N. Y. 449, the court speaking of cause for removal say, that it "necessarily implies some derelictions or general neglect of duty, or incapacity to perform the duties, or some delinquency affecting the general character of the officer and his fitness for the office." Throup in his work on Public Officers, section 366, adopts substantially the same definition. This court in *State ex rel. v. Walbridge, supra,* says that "cause, in legal intendment, means sufficient charges, notice thereof, and a hearing." These definitions as given are general, but we apprehend broad and comprehensive enough to cover any case that might arise. Cause that would justify removal of an officer of one kind or of one public institution, would not be sufficient to justify the removal of an officer of another kind or of another institution. It has been held that the fact that a city marshal was found gambling would not be sufficient cause for his removal. Such a rule could not with safety be applied to the teacher or superintendent of a public school. So repeated acts of harsh treat-

ment by the warden or keeper of a public institution toward the inmates might be justified upon the ground that such treatment was necessary to enforce discipline, yet it would hardly be contended that like acts could be excused in one having in charge young and tender children kept in a public institution for their care and education. So spoken words and printed articles of and concerning one's superiors in office, if spoken and written of men, might be of a comparatively harmless character, and furnish no ground for removal, whereas if the same words and prints had been spoken and published of women in the same official position, might be exceedingly slanderous and manifest such delinquency of character as to furnish ample cause for removal.

To determine whether or not the charges and specifications of which the relator was found guilty are sufficient cause to have justified his removal by the mayor, the case must be considered with reference to the relations of the relator to the institution and the parties said to have been maligned by the publication of the article, and the circumstances under which it was set up, printed, and circulated. The press was the property of the city, in the house of refuge for instruction; it was in the keeping of the relator; the inmates who set it up must have done so by his mediate or immediate direction, for they too were under his control and subject to his orders as superintendent of the institution. The persons against whom he aimed his diatribe of low personal satire and abortive wit, were *women* holding official positions in the city of St. Louis, one the chairmaness of the board of commissioners on charitable institutions, and admittedly the official superior of the relator; the other two were members of the board of managers of the house of refuge, of which the relator was superintendent, and

if not his superiors, were at least his official equals. To these as members of the board of managers he owed official respect, and to their wishes officially communicated to him regarding the affairs and management of the house, it was his duty to give heed, and to carry out when practicable and consistent with the objects and purposes of the institution.

It is contended by relator that the allegation that Bristol permitted the printed article to be set up by others, or by the inmates of the house of refuge, etc., is bad pleading, being in the alternative, and for that reason is insufficient to support the finding of the mayor upon these specifications. By section 2071, Revised Statutes, 1889, a fact may be alleged in the alternative by either party, but the party so pleading must declare his belief of one alternative or the other, and his ignorance whether it be the one or the other. The alternative as pleaded in this case does not come up to the requirements of the statute, and is defective for that reason; but it does not follow that it is insufficient to support a verdict or finding. The objection should have been made by special demurrer or by motion to make the pleading more definite before trial. *Cockerill v. Stafford*, 102 Mo. 57; *Smith v. C. & A. R. R.*, 119 Mo. 246; *Sweet v. Maupin*, 65 Mo. 65; *Elfrank v. Seiler*, 54 Mo. 134. It comes too late here, and we rule this objection against the relator. This brings the case to the point of inquiry whether the acts charged, and of which the relator was found guilty, in view of his official relations to the house of refuge, its inmates, and to the officials against whom the lampooning article was directed, and in view of the fact that the article was set up in the house of refuge by its inmates on a press belonging to the city

OBJECTION to sufficiency of pleading: trial practice.

DEFAMATORY publication by public officer, reflecting on acts of official superiors: removal "for cause."

and after its print was put into circulation, and in view of the further fact that upon his trial before the mayor he failed and refused to make any defense or to offer any excuse for his acts, constitute cause for his removal from office as that term has been defined by the courts and the text writers of the law. To read the scandalous publication in view of all the surrounding circumstances is in our judgment to answer the question in the affirmative. The article was a vile attempt at ridicule,—ridicule of the official acts of the ladies named, ridicule of their language and demeanor, when making an official inquiry of the conditions of the house of refuge,—ridicule of the person of one of them, coupled with a vulgar suggestion. Counsel for relator in his argument termed the publication a silly production. It is this, and more,—it is unappreciative of official courtesy, and an act of official insubordination. The effect of the setting up of this article by the inmates of the house of refuge could have no other influence on them than to excite to insubordination, and inculcate disrespect of the officials of the institution. The moral delinquency manifested by the publication of the article, under all the circumstances, is so apparent and is of so grave a nature as to convince us that Mr. Bristol is not a fit person to hold the office of superintendent of the house of refuge. The motion to quash the judgment of the mayor is overruled, and judgment is given for respondent. Judges BIGGS and BOND concur.

OPINION ON MOTION FOR REHEARING.

BLAND, P. J.—The motion to quash, upon which relator in his brief for rehearing lays so much stress, went to the charges and specifications as a whole. The specific objection now made to specification number 2 is not made in the motion, nor is any specific objection

made to the charge or specifications, as will appear by the motion, which reads as follows:

"Now comes the respondent, and protesting against being required to answer in any manner the alleged charge and specifications preferred against him, moves that the said charge and specifications may be quashed and for naught held, in that the matters and averments therein set forth do not show a violation or neglect of duty on the part of said respondent, do not state a fact from which the requirement of duty on the part of respondent can be lawfully inferred, do not show, in that respect, the respondent owed a duty in the premises to the persons said to have been affected by the publication complained of, and in no manner state cause of removal of the respondent from his office of superintendent of the house of refuge."

Section 2044, Revised Statutes, 1889, requires that a demurrer shall distinctly specify the ground of objection to the pleading. A motion in the nature of a demurrer can not be less specific in the grounds of objection than a demurrer. The objection that the petition or complaint or charge is insufficient to support a verdict or judgment, may be made at any time, and is good whenever or wherever made. We do not find that specification number 2 of the charges against Bristol is open to this objection. The *gravamen* of that charge is, that Bristol caused the objectional article to be set up in print on the printing press belonging to the city. The averment that it was set up by inmates of the house of refuge, or by persons unknown, may very well be treated as surplusage. True the allegation that it was set up by inmates of the house would be in aggravation of the principal offense, if it stood alone, but the fact that it was set up by them could have been proven at the trial without the aver-

VOL. 69 app—43

ment in the charge, for any one of them who did set it up would have been a competent witness to prove the fact.

The charge that Bristol caused the article to be set up in print on the printing press belonging to the city is direct, certain, and admits of no two constructions, and is unambiguous, and in our opinion is sufficiently well pleaded to support the finding of the mayor that he did cause it to be set up as charged, on the printing press of the city, kept at the house of refuge.

· Motion for rehearing overruled. All the judges concur.